ALAN J. LEFEBVRE, ESQ.
Nevada Bar No. 000848
MATTHEW J. CHRISTIAN, ESQ.
Nevada Bar No. 008024
**KOLESAR & LEATHAM, CHTD.**
3320 W. Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Telephone: (702) 362-7800
Facsimile: (702) 362-9472
E-mail:  alefebvre@klnevada.com
         mchristian@klnevada.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| AVIATION INSURANCE HOLDINGS, INC., a Nevada corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CARL S. SHEPHARD, f/k/a CARL S. BALDEY, a Florida resident,<br><br>Defendant. | Case No.:<br><br>**COMPLAINT** |

AVIATION INSURANCE HOLDINGS, INC., by and through its undersigned counsel of record, hereby complains and alleges as follows:

**PARTIES AND JURISDICTION**

1.   AVIATION INSURANCE HOLDINGS, INC. ("AIH" or "Plaintiff"), is a corporation duly organized and validly existing under the laws of the State of Nevada. AIH, as a holding company and corporate parent, controlled, operated, and managed several subsidiaries, all of which were engaged in the business of brokering aviation insurance worldwide under the common brand name of "Aviation Insurance Services." AIH's principal place of business is in Clark County, Nevada.

2.  Non-party AVIATION INSURANCE SERVICES OF NEVADA, INC. ("AIS-NV"), was a corporation duly organized and validly existing under the laws of the State of Nevada. AIS-NV was a subsidiary of AIH and its principal place of business was in Clark County, Nevada. AIS-NV has merged into AIH.

3.  CARL S. SHEPHARD, f/k/a CARL S. BALDEY ("Shephard"), is a resident of Walton County, Florida and a former employee and stockholder of AIS-NV.

4.  Non-party AVIATION INSURANCE SERVICES OF FLORIDA, INC. ("AIS-FL") was a corporation duly organized and validly existing under the laws of the state of Florida and was subsidiary of AIS-NV. As a 7.5% shareholder of AIS-NV, Shephard was employed by AIS-NV to act as president of AIS-FL.

5.  Pursuant to the aforementioned merger and otherwise, Shephard is an employee and shareholder of AIH.

6.  This Court has jurisdiction pursuant to 28 U.S.C. § 1332 as the amount in controversy exceeds $75,000 and there exists complete diversity of citizenship among Plaintiffs and Defendants.

7.  Venue is proper in the District of Nevada pursuant to 28 U.S.C. § 1391 as a substantial part of the events giving rise to the claims herein arose in Clark County, Nevada. In addition, the parties have specifically agreed to resolve disputes, such as that described herein, in Clark County, Nevada.

## GENERAL ALLEGATIONS

### Corporate Structure

8.  AIH, through its subsidiaries, brokered insurance for enterprises and individuals engaged in aviation-related endeavors, including owners of aircraft, parts and accessory manufacturers, aircraft dealers and distributors, airport owners and operators, fixed based aircraft operators, commercial airlines, and other types of prospective insureds. AIH, and its "Aviation Insurance Services" brand, has been recognized in the insurance industry as one of the "top one hundred" (100) insurance brokerages in the United States.

9. Until recently, AIH controlled, managed and operated four subsidiary corporations under the brand name "Aviation Insurance Services," including AIS-NV.

10. AIH owned eighty-two and one-half percent (82.5%) of the shares of AIS-NV. Brad Meinhart, President of AIS-NV, owned ten percent (10%). Shephard owned the remaining seven and one-half percent (7.5%).

11. AIS-FL was a lawful subsidiary of AIH, via AIS-NV. AIS-NV owned one-hundred percent (100%) of the shares of AIS-FL.

12. Given Shephard's interest in AIS-NV, Shephard beneficially but indirectly owned a corresponding interest in AIS-FL. In addition, Shephard was the President of AIS-FL.

13. Aviation Insurance Services (Americas), Inc. was another AIH subsidiary, operating from Miami, FL. Aviation Insurance Services of Illinois, Inc. ("AIS-IL") was yet another AIH subsidiary, operating from Crystal Lake, IL.

14. All of these various insurance brokerage entities reported to, and their activities were directed by, the management of AIH. Ronald A. Hill ("Hill") was the Chief Executive Officer and Chairman of the Board of Directors (the Chief Executive) of each of the subsidiaries, as well as AIH itself. Hill remains the Chief Executive of AIH. Hill is the company's founder and initially owned one hundred percent (100%) of the stock.

### Nature of the Business, Including Sensitivity of Trade Secrets

15. The key employees of Plaintiff's subsidiaries, including Shephard, are licensed as insurance brokers, as that term is understood by state statute. The business of an insurance broker is to negotiate the terms of, procure, and place insurance coverage for a prospective insured, pursuant to the particular needs of that individual or entity.

16. As an insurance brokerage, Plaintiff's subsidiaries acted as intermediaries between insurers/underwriters and insureds. As such, Plaintiff's subsidiaries, through its employees, including Shephard, established and maintained close connections with both insureds and insurers. Insureds relied on Plaintiff's subsidiaries to place insurance with the insurer that will provide the broadest coverage at the best price. Insurers relied on Plaintiff's subsidiaries to locate prospective insureds, execute the coverage, and facilitate renewals and claims.

17. Given the nature of the business, information about insureds, underwriters, clients, and customers (existing, current, or potential in nature) is crucial to success.

### History of Shephard's Employment with AIH's Group of Companies

18. Shephard had been in the employ of a predecessor company in California ("AIS-CA") between 1986 and 1989. He resigned to join a competitor. The day after his resignation, Shephard and his new employer initiated litigation in an attempt to avoid non-competition and non-solicitation provisions in his AIS-CA employment contract. The parties eventually settled that litigation, but the episode is important in that it significantly influenced the contractual language at issue in the present lawsuit, as will be more fully averred in this Complaint.

19. Shephard returned in 1993 as an employee of AIS-CA. AIS-CA moved to Las Vegas in 1994 and merged into AIS-NV. Shephard was Senior Vice President of AIS-NV.

20. In or about 2001, Shephard approached Hill regarding the concept of opening a new office in Destin, Florida with Shephard as its Executive Vice President. Shephard has family in Destin and desired to relocate there. Hill considered the proposal and authorized the formation of AIS-FL as a wholly-owned subsidiary of AIS-NV, since the clients and accounts that Shephard would bring to the new Destin office were all clients and accounts of AIS-NV.

21. Shephard had been President of AIS-FL since 2005.

22. As President of AIS-FL, Shephard had direct responsibility for managing the day-to-day affairs of the Destin, FL subsidiary, including client development and client maintenance.

23. As President of AIS-FL, Shephard had access to extensive confidential and propriety information of Plaintiff, including client lists, vendor lists, pricing information, and information about Plaintiff's business practices.

24. On or about July 21, 1998, as a condition of Shephard's employment, Shephard executed a written contract. The contract contained a provision prohibiting Shephard from competing with his employer or soliciting its business, for two (2) years after termination of employment. The contract was assignable.

25. In late 2008, Hill informed Shephard about potential plans to sell AIH and its group of companies. Those plans did not materialize. Still, the potential sale of AIH and its

subsidiaries spawned an ongoing discussion in the fall of 2008/winter of 2009 between Hill, Shephard, and other senior officers regarding the future control and ownership of AIH and its subsidiaries. Shephard demanded additional salary, additional stock ownership, and/or an additional share of the profits. Hill and Shephard had multiple communications regarding Shephard's future with the companies.

26. Ultimately, in February 2009, Hill and Shephard agreed that Shephard would remain President of AIS-FL under the following terms: Shephard would forego any share of future profits of AIS-NV, but would increase his share of profits of AIS-FL to twenty percent (20%). In addition, he would receive an additional seven and one-half percent (7.5%) of the proceeds of any sale of the companies that exceeded $25,000,000.00. In return, Shephard reaffirmed that he would honor his two-year non-competition/non-solicitation covenant and his consent to assignability.

27. As a result of the circumstances described in the preceding paragraphs, and as a condition to Shephard's continued employment, on or about February 23, 2009, Shephard executed a written contract entitled *Employment Contract* ("02/23/09 employment contract").

28. The terms of the parties' relationship are outlined not only in the 02/23/09 employment contract, but in a Stock Subscription and Shareholder Agreement, which is fully incorporated into the 02/23/09 employment contract at ¶ 5.01.

29. As previously stated, the parties also agreed, and confirmed via letter executed by both parties, that in the event of a sale, Shephard would receive 7.5% of any sale price exceeding $25,000,000. As more fully described below, this provision was later modified, to wit: In the event of a sale, Shephard would receive a flat $250,000.00 regardless of the sale price.

30. The gracious granting of stock in AIS-NV, the increase in profit sharing in AIS-FL, and the new term of compensation in the event of a sale constituted consideration Shephard received in exchange for executing the 02/23/09 employment contract, specifically including the two-year non-competition/non-solicitation covenant and the assignability provision.

31. The various documents governing the parties' overall relationship, their obligations, and their rights (hereinafter the "Employment Contract") are incorporated herein *in*

1  *toto* by this reference, made a part hereof, and will be produced in due course, within this
2  proceeding.

### Specific, Relevant Covenants Contained in Shephard's Employment Contract

32. In the Employment Contract, Shephard promised to devote his "entire productive time, ability, and attention to the business of Employer...." 02/23/09 employment contract at ¶ 2.02(a) ("Devotion to Employer's Business").

33. Shephard agreed to act in the best interest of his employer: "...Employee shall do and perform all services, acts, or things necessary or advisable to manage and conduct the business of Employer, subject at all times to the policies set by Employer's Board of Directors." *Id.* at ¶ 2.01 ("General Duties").

34. Moreover, Shephard specifically agreed not to open any other business, especially a competing business:

> Employee shall not engage in any other business duties or pursuit whatsoever, or directly or indirectly render any services of a business, commercial, or professional nature to any other person or organization, whether for compensation or otherwise....

*Id.* at ¶ 2.02(b).

> ....Employee shall not directly or indirectly acquire, hold, or retain any interest in any business competing with or similar in nature to the business of Employer, or in any manner compromise his duty of loyalty to the Employer....

*Id.* at ¶ 2.02(c).

> Employee shall not, directly or indirectly, either as an employee, employer, consultant, agent, principal, partner, stockholder, corporate officer, director, or in any other capacity, engage or participate in any business that is in competition in any manner whatsoever with the business of Employer.

*Id.* at ¶ 2.03 ("Competitive Activities").

35. Shephard also "acknowledge[d] and agree[d] that . . . [Shephard] shall have access to and become acquainted with information concerning the operations of Employer, and the identity of insurance and insurance brokerage clients of Employer and such clients' operations, including without limitation, financial, personnel, underwriting rates, details thereof,

and sales...." The Employment Contract defines such information as "Trade Secrets." *Id.* at ¶ 2.04(a).

36. The Employment Contract provides, among other things, that Shephard "shall not disclose any such trade secrets directly or indirectly..." *Id.* at ¶ 2.04(b).

37. The Employment Contract further provides that all files and records relating to Employer's business "are and shall remain exclusively the property of Employer." *Id.* at ¶ 2.04(c).

38. The Employment Contract further provides that, for a period of twenty-four (24) months after voluntary or involuntary termination of employment, Shephard would not "call upon any clients of Employer for the purpose of diverting, soliciting, negotiating, or contracting any insurance products or services..., induce clients...to terminate, cancel, not renew, or not place business with Employer..., solicit prospective client of Employer...., or... work for any client or competitor of Employer...." *Id.* at ¶ 2.05(a).

39. Shephard further agreed not to "solicit or endeavor to cause any employee of Employer to leave employment with Employer." *Id.* ¶ 2.06.

40. Shephard acknowledged and agreed that remedies at law would be inadequate in the event of any breach of the Employment Contract. Therefore, Shephard consented and agreed to the entry of injunctive and other equitable relief. *Id.* at ¶ 9.02.

41. Shephard also agreed that he would reimburse Plaintiff for all reasonable attorneys' fees and costs incurred during litigation relating to the Employment Contract. *Id.* at ¶ 9.04; Stock Subscription Agreement at ¶ 11.10.

42. Shephard agreed that his contract would be not be terminated by "any voluntary or involuntary dissolution of Employer resulting from either a merger or consolidation in which Employer is not the consolidated or surviving corporation, or a transfer of all or substantially all of the assets of Employer." 02/23/09 employment contract at ¶ 8.04(a). Rather, the Employment Contract "may be assigned to the surviving or resulting corporation or the transferee of Employer's assets." *Id.* at 8.04(b).

. . .

### Shephard's 2009 Acts of Disloyalty

43. Immediately prior to executing the 02/23/09 employment contract, and during the time that Shephard and Hill were negotiating Shephard's future with AIH's group of companies, Shephard suggested that AIS-FL hire Michael O'Donnell ("O'Donnell"), who had recently been terminated by a competitor. Shephard sent O'Donnell an email offering employment on January 7, 2009. O'Donnell executed a contract of employment on February 11, 2009.

44. At approximately the same time, Shephard formed a company named "Elite Insurance Brokers, LLC" ("Elite"), a Florida limited liability company. He did so on January 30, 2009. Shephard was the listed manager and Shephard's home address was the company's mailing address and principal address.

45. Hill discovered the existence of Elite in or about January, 2009. Hill viewed Elite as the potential business vehicle that Shephard would need if he left his employment. Hill, therefore, reasonably considered the existence of Elite as an indication of disloyalty and a breach of Shephard's existing employment contract and an anticipatory breach of the employment contract then being negotiated. Elite would be a potential competitor to AIH's group of companies. As such, Hill asked Shephard to dissolve Elite, which Shephard agree to do. Shephard repeatedly promised to do so during and after negotiations leading to the 02/23/09 employment contract. However, Shephard did not actually dissolve Elite until May 21, 2009.

46. Unbeknownst to Hill, however, only a few days later, another company was formed in Florida. On June 1, 2009, Shephard, O'Donnell, and Curt Kienast formed Aviation Insurance Direct, Inc. ("AID"), a Florida corporation. The principal address of AID is O'Donnell's home address. O'Donnell is the registered agent. Shephard is named AID's chief executive officer.

47. On April 14, 2010, Hill confronted Shephard about the formation of AID. Shephard again agreed to dissolve the anticipatorily-competing corporation and to remain loyal to AIH.

. . .

. . .

### 2010 Acts of Disloyalty Leading Up to Merger

48. In or about May 2010, Hill began having conversations with a large insurance brokerage ("LIB") regarding a merger with, or sale to, LIB (the "Transaction"). Hill informed Shephard of the negotiations.

49. Pursuant to the negotiations, Hill and LIB agreed to a closing of the Transaction on December 13, 2010. The Transaction required that all AIH subsidiaries be merged into AIH.

50. Until early December 2010, Shephard had continually represented to Hill and others that he was in agreement with the Transaction, which would have required Shephard to become an employee of LIB.

51. Shephard, in fact, as a shareholder of AIS-NV, agreed to merge AIS-NV into AIH and executed other documents necessary to the Transaction. Pursuant to the merger, Shephard is an employee and shareholder of AIH and his Employment Contract (including all subsequent modifications) has been assigned to AIH.

52. Moreover, on November 8, 2010, Shephard and Hill memorialized their agreement that Shephard would be compensated a flat $250,000.00 when the Transaction closed (and not 7.5% of any sale price over $25,000,000.00). *See* ¶¶ 27, 30, *supra*. Shephard accepted this term in full contemplation of the pending Transaction and as advanced and negotiated consideration for cooperating with the Transaction over and above ordinary consideration contained in his 02/23/09 employment contract.

53. Shephard's execution of the November 8, 2010 letter agreement constituted Shephard's consent to the contingency of the Transaction and recognition of the imminent prospect that the AIH group of companies would be sold in the near term.

54. Shephard acknowledged the $250,000.00 premium as fair value for his consent to the Transaction and his continued loyalty and fidelity to the continuing enterprise, and to his fellow shareholders, directors, and officers within the AIH group of companies.

55. Thereafter, despite the execution of the Transaction documents and the reaffirmation of the terms of his Employment Contract, Shephard began balking at becoming an employee of LIB, even though all other stockholders and principal employees had agreed, and

even though Shephard had earlier represented that he would agree to become an employee of LIB. In the end, at the time of closing, Shephard refused to execute an employment contract with LIB.

56. Shephard's refusal to execute an employment contract required a wholesale renegotiation between LIB and AIH. In order to (belatedly) close the transaction, AIH was forced to accept consideration from LIB that was significantly lower than previously agreed. The net result was that AIH's several stockholders received significantly less consideration than they would have had Shephard fulfilled his promises.

57. Due to Shephard's refusal to cooperate and honor his obligations, AIH and its principals were forced to defer significant consideration that was to be received to close the Transaction. The closing of the Transaction was delayed to accommodate changes brought about by Shephard's last-minute reneging, causing unnecessary attorneys' fees.

58. At the time of the Transaction, AIH is informed and believes that Shephard intends to directly compete and solicit AIS-FL clients, either through AID or some other wrongfully-created corporate competitor. This constitutes an ongoing breach of the non-solicitation and non-competition provisions in the Employment Contract.

59. At the time of the Transaction, AIH is informed and believes that Shephard possessed and retained Trade Secrets he had obtained by virtue of his employment, including extensive information regarding customers, vendors, and business practices. This information constituted "Trade Secrets" under ¶ 2.04 the 02/23/09 employment contract.

60. Moreover, AIH reasonably fears that Shephard will, after his termination, contact and directly solicit, and/or facilitate the solicitation of, business of current, former, and potential customers of Plaintiff, in violation of his Employment Contract.

## FIRST CAUSE OF ACTION
(BREACH OF CONTRACT)

61. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

62. Shephard materially breached the Employment Contract by engaging in the above-referenced activities and behavior, including, *inter alia*:

    a. Retaining and/or disclosing Trade Secrets of Plaintiff;

    b. Directly soliciting, and/or facilitating the solicitation, of Plaintiff's business, customers, and potential customers;

    c. Forming and maintaining AID; and

    d. Convincing Hill, through deceit, to hire O'Donnell even though O'Donnell's loyalty rests not with AIH's group of companies, but with Shephard personally.

    e. Acting in his own interest, and not the interest of AIS-NV and AIH, in sale negotiations, nearly thwarting the Transaction and causing the immediate sale price to be substantially lowered.

63. Shephard's material breaches of the Employment Contract have subjected Plaintiff, and continue to subject Plaintiff, to substantial and irreparable harm for which no adequate remedy exists at law.

64. Shephard's breaches of the Employment Contract have also damaged Plaintiff in an amount in excess of $75,000.00.

65. By reason of Shephard's breaches of the Employment Contract, Plaintiff has been required to retain attorneys to prosecute this suit, and, pursuant to the Employment Contract, Stock Subscription and Shareholder Agreement, and Nevada law, Plaintiff is entitled to recover its reasonable attorneys' fees and costs.

## SECOND CAUSE OF ACTION

(BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING)

66. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

67. Shephard's actions, as set forth above, constitute breaches of the covenant of good faith and fair dealing that is implied in every contract in the State of Nevada.

68. Shephard's breaches of the implied covenant of good faith and fair dealing have subjected, and continue to subject, Plaintiff to substantial irreparable harm for which no adequate remedy exists at law.

69. Shephard's breaches of the covenant of good faith and fair dealing have also damaged Plaintiff in an amount in excess of $75,000.00.

70. By reason of Shephard's breaches of the covenant of good faith and fair dealing, Plaintiff has been required to retain attorneys to prosecute this suit, and, pursuant to the Employment Contract, Stock Subscription and Shareholder Agreement, and Nevada law, Plaintiff is entitled to recover its reasonable attorneys' fees and costs.

## THIRD CAUSE OF ACTION

(MISAPPROPRIATION OF TRADE SECRETS)

71. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

72. The Trade Secrets retained by Shepherd after he voluntarily terminated his employment with Plaintiff, constitute "trade secrets" of Plaintiff's under NRS 600A.101, *et seq.*

73. By his actions as described above, Shephard has, by improper means, misappropriated Plaintiff's Trade Secrets. Without limiting the generality of the foregoing, Shephard knew or had reason to know that the Trade Secrets were owned by Plaintiff and the use thereof was prohibited under the Employment Contract.

74. This misappropriation of the Trade Secrets by Shephard has subjected, and continues to subject, Plaintiff to substantial irreparable harm for which no adequate remedy exists at law. Plaintiff is therefore entitled, under NRS 600A.040, to injunctive relief as set forth below.

75. The misappropriation of the Trade Secrets by Shephard has also damaged Plaintiff in an amount in excess of $75,000.00.

76. In addition to injunctive relief and damages for loss, Plaintiff is entitled under NRS 600A.050 to all the profits Shephard derives from his misappropriation of Plaintiff's Trade Secrets. Without limiting the generality of the foregoing, Plaintiff is entitled to an award of all

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

1  profits Shephard has derived, or may in the future derive, in connection with his use of the Trade
2  Secrets.

3      77.    The misappropriation of Plaintiff's Trade Secrets by Shephard was willful, wanton and reckless, and was done under circumstances evidencing disregard of the rights of the owner of the Trade Secrets. Under NRS 600A.050(2), therefore, Plaintiff is entitled to punitive damages in an amount to be decided by the Court.

    78.    By reason of the misappropriation of Plaintiff's Trade Secrets by Shephard, Plaintiff has been required to retain attorneys to prosecute this action. Pursuant to NRS 600A.060, Plaintiff is entitled to recover its attorneys' fees and costs.

## FOURTH CAUSE OF ACTION
### (INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS AND PROSPECTIVE BUSINESS ADVANTAGE)

    79.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

    80.    At the time of the events described above, Plaintiff had existing and prospective contractual relationships with its customers, potential customers, and LIB. At all times relevant hereto, Shephard had knowledge of those contractual relationships.

    81.    The solicitation of insurance business of Plaintiff's customers and potential customers by Shephard is wrongful and without privilege or legal justification. This solicitation is carried out with the intent to, and in fact would, interfere with Plaintiff's existing and prospective contractual relationships with one or more of its customers or potential customers.

    82.    Refusing to cooperate with the Transaction, and to complete his portion of the Transaction, was wrongful and without privilege or legal justification. Shephard intended to, and in fact did, interfere with Plaintiff's existing and prospective contractual relationship with LIB.

    83.    The tortious interference by Shephard with the contractual relationships between Plaintiff and its customers, potential customers, and LIB, has subjected, and continues to subject, Plaintiff to substantial irreparable harm for which no adequate remedy exists at law. Plaintiff is, therefore, entitled to injunctive relief as set forth below.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

84. The tortious interference by Shephard with Plaintiff's contractual relationships has also damaged Plaintiff in an amount in excess of $75,000.00.

85. The tortious interference by Shephard with Plaintiff's contractual relationships was committed under circumstances constituting oppression, malice, and/or fraud. Plaintiff is, therefore, entitled to punitive damages in an amount to be decided by the Court.

86. By reason of the tortious actions of Shephard, Plaintiff has been required to retain attorneys to prosecute this action, and Plaintiff is entitled to recover its reasonable attorneys' fees and costs.

## **FIFTH CAUSE OF ACTION**

(BREACH OF FIDUCIARY DUTY AND BREACH OF LOYALTY)

87. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

88. Within the AIH group of companies, Shephard enjoyed the status as a fellow shareholder and officer with Hill and others. Shephard is and was a fiduciary to his fellow shareholders and officers, as well as to the companies, including AIH.

89. Shephard breached his duty to AIS-NV by, *inter alia*:

    a. Retaining and/or disclosing Trade Secrets of Plaintiff;

    b. Directly soliciting, and/or facilitating the solicitation, of Plaintiff's business, customers, and potential customers;

    c. Forming and maintaining AID; and

    d. Convincing Hill, through deceit, to hire O'Donnell even though O'Donnell's loyalty rests not with AIH's group of companies, but with Shephard personally.

    e. Acting in his own interest, and not the interest of AIS-NV and AIH, in sale negotiations, nearly thwarting the Transaction and causing the immediate sale price to be substantially lowed.

90. Shephard's breach of his fiduciary duty was willful, intentional, or grossly negligent.

91. Plaintiff sustained damages in excess of $75,000 as a result of Shephard's breach of his fiduciary duty.

92. By reason of Shephard's breaches of his fiduciary duty, Plaintiff has been required to retain attorneys to prosecute this suit, and, pursuant to the Employment Contract, Stock Subscription and Shareholder Agreement, and Nevada law, Plaintiff is entitled to recover its reasonable attorneys' fees and costs.

### SIXTH CAUSE OF ACTION

(INTENTIONAL MISREPRESENTATION COLORED WITH INCIDENTS OF FRAUD)

93. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

94. On multiple occasions in 2010, Shephard falsely represented that he would take employment with LIB and otherwise cooperate in the Transaction.

95. Shephard knew or believed that his representations were false.

96. Shephard intended to induce AIH and its principals to act or refrain from acting upon the misrepresentation.

97. AIH and its principals justifiably relied upon Shephard's misrepresentations to their detriment.

98. AIH and its principals sustained damages as result, including, *inter alia*, a significant reduction in the consideration obtained for closing the Transaction, diminution in value of AIH and its group of companies, attorneys' fees and costs for modifying the Transaction, and attorneys' fees and costs for initiating and prosecuting this lawsuit.

99. By reason of Shephard's breach of his fiduciary duty, Plaintiff has been required to retain attorneys to prosecute this suit, and, pursuant to the Employment Contract, Stock Subscription and Shareholder Agreement, and Nevada law, Plaintiff is entitled to recover its reasonable attorneys' fees and costs.

. . .

. . .

. . .

## SEVENTH CAUSE OF ACTION

(DECLARATORY RELIEF)

100. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

101. Shephard has taken actions inconsistent with the promises contained in his Employment Contract and in negotiations leading to the Transaction.

102. Shephard's actions are unilateral and unauthorized.

103. Plaintiff is entitled to declaratory relief concerning its rights under the Employment Contract, namely (1) Shephard's inability to use Plaintiff's Trade Secrets, (2) Shephard's inability to solicit Plaintiff's business, (3) Shephard's inability to engage in the business of aviation insurance brokering for the next twenty-four months, and (4) the amount of compensation due to Shephard under the various agreements referenced herein.

104. The interests of the parties are adverse regarding this justiciable controversy.

105. The issues are ripe for judicial determination because they present an existing controversy and harm is likely to occur in the future without the Court's adjudication of the parties' rights.

106. Plaintiff has been required to retain attorneys to prosecute this suit, and, pursuant to the Employment Contract, Stock Subscription and Shareholder Agreement, and Nevada law, Plaintiff is entitled to recover its reasonable attorneys' fees and costs.

## EIGHTH CAUSE OF ACTION

(PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF)

107. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

108. Based on all of the foregoing allegations, Plaintiff is entitled to a preliminary and permanent injunction providing as follows:

   a. Prohibiting Shephard from calling upon, soliciting, seeking business from, working for, contracting with, performing insurance services for, or otherwise contacting any persons or entities who are now, or who were at

        any time during Shephard's employment by Plaintiff, clients or Customers of Plaintiff;

    b.    Prohibiting Shephard from keeping, referring to, or otherwise using any of Plaintiff's Trade Secrets, including, without limitation, any and all customer or client lists or contact information, pricing schedules, employee handbooks, procedures, manuals, or any other information regarding Plaintiff's business;

    c.    Requiring Shephard to return any and all such Trade Secrets, whether kept or recorded digitally or in written or printed form, to Plaintiff;

    d.    Requiring, pursuant to NRS 600A.050, Shephard to disgorge and pay to Plaintiff all profits derived from his use of Plaintiff's Trade Secrets;

    e.    Requiring Shephard to dissolve AID or any other company formed to wrongly solicit and compete; and

    f.    Requiring Shephard to forego the formation of any other business intended to compete with Plaintiff or AIH's group of companies or encouraging any employee of Plaintiff to leave its employ.

WHEREFORE, Plaintiff prays for relief as follows:

1. For preliminary and permanent injunctive relief as set forth above;
2. For damages in excess of $75,000.00;
3. For an additional award of all profits derived by Shephard from his misappropriation of Plaintiff's Trade Secrets;
4. For punitive damages in an amount to be decided by the Court;
5. For attorneys' fees and costs; and

. . .

. . .

. . .

. . .

. . .

6.   For such further relief as the Court may deem warranted.

DATED this 17th day of December, 2010.

KOLESAR & LEATHAM, CHTD.

By _____
ALAN J. LEFEBVRE, ESQ.
Nevada Bar No. 000848
MATTHEW J. CHRISTIAN, ESQ.
Nevada Bar No. 008024
3320 W. Sahara Avenue, Suite 380
Las Vegas, Nevada  89102

*Attorneys for Plaintiff*